1  BLOOD HURST & O'REARDON, LLP
   TIMOTHY G. BLOOD (149343)
2  LESLIE E. HURST (178432)
   THOMAS J. O'REARDON II (247952)
3  PAULA M. ROACH (254142)
   701 B Street, Suite 1700
4  San Diego, CA  92101
   Tel: 619/338-1100
5  619/338-1101 (fax)
   tblood@bholaw.com
6  lhurst@bholaw.com
   toreardon@bholaw.com
7  proach@bholaw.com

8  BEASLEY, ALLEN, CROW, METHVIN,          THE SMITH LAW FIRM
       PORTIS & MILES, P.C.                ALLEN SMITH, JR.
9  W. DANIEL "DEE" MILES, III              618 Towne Center Blvd., Suite B
   LANCE C. GOULD                          Ridgeland, MS 39157
10 ALISON DOUILLARD HAWTHORNE              Tel: 601/952-1422
   272 Commerce Street                     601/952-1426 (fax)
11 Post Office Box 4160                    allen@smith-law.org
   Montgomery, AL 36103
12 Tel: 334/269-2343
   224/954-7555 (fax)
13 Dee.Miles@BeasleyAllen.com
   Lance.Gould@BeasleyAllen.com
14 Alison.Hawthorne@BeasleyAllen.com

15 Attorneys for Plaintiff and the Class

16              **UNITED STATES DISTRICT COURT**

17             **EASTERN DISTRICT OF CALIFORNIA**

18 MONA ESTRADA, On Behalf of Herself     | Case No.:
   and All Others Similarly Situated,     |
19                                         | CLASS ACTION
                Plaintiff,                 |
20                                         | **CLASS ACTION COMPLAINT FOR:**
        v.                                 | 1.  **VIOLATION OF CONSUMERS
21                                         |     LEGAL REMEDIES ACT, CIVIL
   JOHNSON & JOHNSON and JOHNSON           |     CODE §1750** *et seq.***;**
22 & JOHNSON CONSUMER                      | 2.  **VIOLATION OF THE UNFAIR
   COMPANIES, INC.,                        |     COMPETITION LAW, BUSINESS
23                                         |     AND PROFESSIONS CODE §17200**
                Defendants.                |     *et seq.***;**
24                                         | 3.  **NEGLIGENT
                                           |     MISREPRESENTATIONS; and**
25                                         | 4.  **BREACH OF IMPLIED
                                           |     WARRANTY**
26
27                                           DEMAND FOR JURY TRIAL
28

Case No.

BLOOD HURST & O'REARDON, LLP

00069681

CLASS ACTION COMPLAINT

Plaintiff Mona Estrada brings this action on behalf of herself and all others similarly situated against Defendants Johnson & Johnson ("J&J") and Johnson & Johnson Consumer Companies, Inc. ("J&J Consumer") (together, "Defendants") and states:

## NATURE OF ACTION

1.      Defendants manufacture, distribute, and market Johnson's® Baby Powder ("Baby Powder").  Johnson's® Baby Powder is comprised entirely of talc with a small amount of fragrance.  Talc is a hydrous magnesium silicate, an inorganic material that is mined from the earth.

2.      Defendants market the Baby Powder as a means of eliminating friction on the skin and absorbing moisture, while keeping skin cool and comfortable.  Defendants market the Baby Powder for use on infants "after every bath and diaper change" and for women to "[u]se anytime you want skin to feel soft, fresh and comfortable."  Consumers expect talc to be safe to use.  In fact, the only warnings Defendants provide to consumers about the dangers of the Baby Powder is to keep the powder away from eyes, avoid inhalation of the powder, and use the powder externally.  Defendants do not provide any other warnings about the Baby Powder.

3.      Johnson's® Baby Powder is not safe.  As numerous studies have confirmed, Johnson's® Baby Powder leads to a significant increased risk of ovarian cancer.  Women who used talc-based powders to powder their genital area have a 33% increased risk of ovarian cancer compared to those women who never used the powders.

4.      Despite the potential catastrophic health consequences, Defendants do not tell consumers about the dangers associated with the talc-based Johnson's® Baby Powder.  Instead, Defendants continue to expressly and impliedly represent that the product is safe and intended for women to use the Baby Powder in the very manner most likely to result in an increased risk of ovarian cancer.  As a result of Defendants' misrepresentations and omissions regarding the safety of Johnson's® Baby Powder, Plaintiff and the proposed Class have purchased a product which is potentially lethal.

5.      Plaintiff brings this action on behalf of herself and other similarly situated consumers who have purchased Johnson's® Baby Powder to require Defendants to properly

1   inform consumers regarding the health hazards of using Johnson's® Baby Powder and obtain

2   redress for those who have purchased Johnson's® Baby Powder.  Based on violations of state

3   unfair competition laws and Defendants' negligent omissions and misrepresentations and

4   breach of implied warranty, Plaintiff seeks injunctive and monetary relief for consumers who

5   purchased Johnson's® Baby Powder.  Plaintiff has suffered injury in fact and lost money as a

6   result of the unfair business practices alleged in the form of the purchase price paid for

7   Johnson's® Baby Powder.

**JURISDICTION AND VENUE**

9   6.      This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2).  The

10  matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000

11  and is a class action in which there are in excess of 100 class members and many members of

12  the Class are citizens of a state different from Defendants.

13  7.      This Court has personal jurisdiction over Defendants because Defendants are

14  authorized to conduct and do conduct business in California.  Defendants have marketed,

15  promoted, distributed, and sold Johnson's® Baby Powder in California and Defendants have

16  sufficient minimum contacts with this State and/or sufficiently avail themselves of the markets

17  in this State through their promotion, sales, distribution and marketing within this State to

18  render the exercise of jurisdiction by this Court permissible.

19  8.      Venue is proper in this Court pursuant to 28 U.S.C. §§1391(a) and (b) because

20  a substantial part of the events or omissions giving rise to Plaintiff's claims occurred while he

21  resided in this judicial district.  Venue is also proper under 18 U.S.C. §1965(a) because

22  Defendants transact substantial business in this District.

**PARTIES**

24  9.      Plaintiff Mona Estrada resides in Stockton, California.  From about 1950 to

25  sometime in 2013, Plaintiff purchased Johnson's® Baby Powder for personal use in the genital

26  area.  Prior to making her purchase, Plaintiff read the label for the Baby Powder.  In reliance

27  on the label described herein and above, and her belief that external use of the product was

28  safe to use, Plaintiff purchased Johnson's® Baby Powder.   Most recently,   she   paid

BLOOD HURST & O'REARDON, LLP

00069681

2

Case No.

CLASS ACTION COMPLAINT

approximately $3.50 for the product. Plaintiff purchased the product believing it was safe to use on any external area of her body. Had Plaintiff known the truth about the safety of using Johnson's® Baby Powder, she would not have purchased the product. As a result of her purchase, Plaintiff suffered injury in fact and lost money. Plaintiff is not claiming physical harm or seeking the recovery of personal injury damages.

10. Defendant Johnson & Johnson ("J&J") is a New Jersey corporation with its principle place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. J&J is in the business of manufacturing and selling consumer products. J&J marketed, distributed, and sold Johnson's® Baby Powder products to hundreds of thousands of consumers in the United States, including in California.

11. Defendant Johnson & Johnson Consumer Companies, Inc. is incorporated under the laws of the state of New Jersey. Defendant's corporate headquarters is located at 199 Grandview Road Skillman, New Jersey 08558. Johnson & Johnson Consumer Companies, Inc. operates as a subsidiary to Johnson & Johnson. Defendant researches, develops, manufactures, distributes, markets, and sells consumer products targeted at babies and mothers, including Johnson's® Baby Powder. Defendant marketed, distributed, and sold Johnson's® Baby Powder products to hundreds of thousands of consumers in the United States including in California.

## FACTUAL ALLEGATIONS

### Johnson's® Baby Powder Is Intended for Use by Women

12. In 1893, Defendants developed Johnson's® Baby Powder. For decades Defendants have manufactured, distributed, marketed and sold Johnson's® Baby Powder as a daily use powder intended to eliminate friction on the skin and to absorb unwanted excess moisture for both babies and women.

13. Defendants have consistently marketed Johnson's® Baby Powder for use on women to maintain freshness and cleanliness. Historically, the Baby Powder label and advertising encouraged women to dust themselves with the Baby Powder daily to mask odors.

14. Although the label has changed over time, the message is the same: that the

BLOOD HURST & O'REARDON, LLP

1  product is safe for use on women as well as babies.  The Baby Powder label currently states

2  that "Johnson's® Baby Powder is designed to gently absorb excess moisture helping skin feel

3  comfortable.  Our incredibly soft, hypoallergenic, dermatologist and allergy-tested formula

4  glides over skin to leave it feeling delicately soft and dry while providing soothing relief."

5  Defendants instruct consumers on the product labeling to "Shake powder directly into your

6  hand, away from the face, before smoothing onto the skin."

7     15.     Representative product packaging and labeling for Johnson's® Baby Powder

8  appears as follows:



BLOOD HURST & O'REARDON, LLP

Case No.

CLASS ACTION COMPLAINT

00069681

16.     Through other marketing, including on their website for Johnson's® Baby Powder, Defendants similarly encouraged women to use the product daily.  Defendants state that Johnson's® Baby Powder "keeps skin feeling soft, fresh and comfortable.  It's a classic.  Johnson's® Baby Powder helps eliminate friction while keeping skin cool and comfortable.  It's made of millions of tiny slippery plates that glide over each other to help reduce the irritation caused by friction."  Under a heading "How to Use," "For skin that feels soft, fresh and comfortable, apply Johnson's® Baby Powder close to the body, away from the face.  Shake powder into your hand and smooth onto skin."  Under a heading "When to Use",

Defendant recommends consumer "Use anytime you want skin to feel soft, fresh and comfortable.  For baby, use after every bath and diaper change."  On their website for Johnson's® Baby Powder, Defendants also state the product is "Clinically proven to be safe, gentle and mild."

17.     Defendants seek to convey an image as a safe and trusted family brand.  For example, Defendants have a website, www.safetyandcarecommitment.com, devoted to "Our Safety & Care Commitment."  According to Defendants, "safety is our legacy" and "[y]ou have our commitment that every beauty and baby care product from the Johnson & Johnson Family of Consumer Companies is safe and effective when used as directed."  Defendants market a "Five-Level Safety Assurance Process," which they describe as follows: "for decades, ours has been one of the most thorough and rigorous product testing processes in our industry – to ensure safety and quality of every single product we make."  Defendants' so-called "Promise to Parents and their Babies" includes that "[w]hen you bring our baby care products into your home, you can be assured of our commitment to the safety of your family and families around the world."  Nowhere do Defendants warn of the increased risk of ovarian cancer linked to the use of Johnson's® Baby Powder.

18.     Johnson's® Baby Powder is made entirely of talc and fragrance.  Talc is a mineral composed of hydrated magnesium silicate that is mined from the earth.  It is an inorganic material.  Talc is used in to manufacture goods, such as paper making, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics.  In its loose form and as used in the Baby Powder, talc is known as "talcum powder."

19.     As detailed below, beginning in at least 1982, Defendants were aware of several studies that demonstrated that women who used talc-based baby powder in the genital area had a significant increased risk of ovarian cancer.  Since 1982, there have been 21 studies by doctors and scientists throughout the world (including 19 case-control studies, 1 cohort study, and 1 combined case-control and cohort study) that reported an elevated risk for ovarian cancer with genital talc use.  The majority of these studies show a statistically significant increased risk of ovarian cancer.

BLOOD HURST & O'REARDON, LLP

CLASS ACTION COMPLAINT

00069681

20.     However, Defendants do not warn or inform consumers anywhere, including on the product labeling or in its marketing or advertising for the product, that use of Johnson's® Baby Powder may be harmful to health, including significantly increasing the risk of ovarian cancer.

### Defendants Knew of the Increased Risk of Ovarian Cancer
### From Use of Johnson's® Baby Powder

**A.     The Overwhelming Scientific and Medical Evidence**

21.     Research conducted as early as 1961 showed that particles similar to talc can translocate from the exterior genital area to the ovaries of women.  *See* Egi, G.E. and Newton, M., *The transport of carbon particles in the human female reproductive tract*, 12 Fertil. Steril. 151-155 (1961).

22.     Because of the potential for transmission, researchers remained concerned about the carcinogenic nature of talc and the effects of talc use.  A 1968 study concluded that "[a]ll of the 22 talcum products analyzed have a … fiber content ... averaging 19%.  The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile [asbestos-like fibers] as these are often present in fibrous talc mineral deposits . . .  Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem."  Cralley LJ, et al., *Fibrous and mineral content of cosmetic talcum products*, 29 Am. Ind. Hyg. Assoc. J. 350-354 (1968).  In a 1976 follow up study, researchers concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc. . .We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products."  Rohl AN, et al, *Consumer talcums and powders: mineral and chemical characterization*,  2 J. Toxicol. Environ. Health 255-284 (1976).

23.     The first study to suggest a link between ovarian cancer and talc powder use was conducted in 1971.  In that study, researchers found talc particles "deeply embedded" in 10 of 13 ovarian tumors, 12 of 21 cervical tumors, one primary carcinoma of the endometrium,

BLOOD HURST & O'REARDON, LLP

and 5 of 12 "normal" ovaries from women with breast cancer.  Henderson, W.J., et al., *Talc and carcinoma of the ovary and cervix*, 78 (3) J. Obstet. Gynaecol. Br. Commonw. 266-272 (1971).

24.     The scientific evidence linking talc use and ovarian cancer continued to build. In 1982, Daniel Cramer of the Departments of Obstetrics, Gynecology, and Pathology, Boston Hospital for Women, Division of the Brigham and Women's Hospital, the Department of Epidemiology, Harvard School of Public Health and the Department of Pathology, Massachusetts General Hospital, Harvard Medical School, conducted a case-control study which found that talc applied directly to the genital area around the time of ovulation leads to talc particles becoming deeply imbedded in the substance of the ovary causing foreign body reaction and growth of epithelial ovarian tissue.  The study found a statistically significant 92% increased risk of ovarian cancer from genital talc use.   This study proved an epidemiologic association between the use of cosmetic talc in genital hygiene and ovarian cancer.  This study was funded by a grant from National Institutes of Health (NIH).  Cramer, D.W., et al., *Ovarian cancer and talc:  a case control study*, 50 Cancer 372-376 (1982).  Soon after this study was published, Dr. Cramer was contacted and visited by Dr. Bruce Semple from J&J whereby Dr. Cramer advised Dr. Semple to place a warning on his company's talc-based body powders regarding the increased risk of ovarian cancer.

25.     Since 1982, there have been 21 additional studies by different doctors and scientists throughout the world including 19 case-control studies, 1 cohort study, and 1 combined case-control and cohort study, which have provided epidemiologic data addressing the talc and ovarian cancer association.  Nearly all of these studies have reported an elevated risk for ovarian cancer associated with perineum use of talcum powder and the majority of the studies show statistically significant elevations.

26.     In 1983, Patricia Hartge and Robert Hoover of the National Cancer Institute and Linda Lester and Larry McGowan of the George Washington University Medical Center, performed a case-control study and found a 150% increased risk of ovarian cancer for women who use talcum powder in the genital area.  Hartge, P. et al., *Talc and ovarian cancer*, JAMA

BLOOD HURST & O'REARDON, LLP

00069681

1983, 1844.

27.     Similarly, in 1988, a case control study of 188 women diagnosed with epithelial ovarian cancer and 539 control women found that 52% of the cancer patients habitually used talcum powder on the perineum before their cancer diagnosis.  The study showed a 40% increase in risk of ovarian cancer in women that used talcum powder on their perineum and a positive dose-response relationship.  *See* Whittemore, A.S., et al., *Personal and environmental characteristics related to epithelial ovarian cancer.  II. Exposures to talcum powder, tobacco, alcohol, and coffee*, Am. J. Epidemiol. 1228-1240 (1988).

28.     Another case control study conducted in 1989 found similar results.  The study looked at 235 women diagnosed with epithelial ovarian cancer and 451 controls and found a 29% increased risk in ovarian cancer with women who reported genital talcum powder use more than once per week.  *See* Booth, M. et al., *Risk factors for ovarian cancer: a case-control study*, Br. J. Cancer, 592-598 (1989).

29.     A case control study conducted in 1989 by Bernard Harlow, et al., of Harvard Medical School at Brigham and Women's Hospital, found an increased risk of ovarian cancer generally from genital talc use after bathing and found a statistically significant 180% increased risk of ovarian cancer from women that used talc-containing powders in combination with deodorizing powders on their perineum.  This study also found positive dose-response relationship.  Harlow, B.L. & Weiss, N.S., *A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc*, Am. J. Epidemiol., 390-394 (1989).

30.     In 1992, a case-control study was conducted by Karin Rosenblatt, et al., from the Department of Epidemiology, The Johns Hopkins School of Hygiene and Public Health and Department of Gynecology and Obstetrics.  This study that found a 70% increased risk in women from genital talc use and found a 379% increased risk of ovarian cancer of women who used talc on sanitary napkins in their genital area.  Rosenblatt, K.A. et al., *Mineral fiber exposure and the development of ovarian cancer*, 45 (1) Gynecol. Oncol. 20-25 (1992).

///

///

BLOOD HURST & O'REARDON, LLP

00069681

31.    Additionally, a 1992 case-control study conducted by Yong Chen, et al., of 112 diagnosed epithelial ovarian cancer cases and 224 age-matched community controls, found an elevated risk of 290% for ovarian cancer for women who applied talc-containing dusting powder to the lower abdomen and perineum for longer than 3 months.  Yong Chen et al., *Risk Factors for Epithelial Ovarian Cancer in Beijing, China*, Int. J. Epidemiol., 23-29 (1992).

32.    In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity.  The study found "some evidence of carcinogenic activity in make rats" and "clear evidence of carcinogenic activity in female rats."  Accordingly, talc was found to be a carcinogen, with or without the presence of asbestos-like fibers.  National Toxicology Program, *Toxicology and carcinogenesis studies of talc (CAS No 14807-96-6) in F344/N rats and B6C3F 1 mice (Inhalation studies)*, Technical Report Series No 421 (Sept. 1993).

33.    In 1995, a case control study was conducted in Australia by David Purdie, et al., involving over 1600 women.  This was the largest study of its kind to date.  This study found a statistically significant 27% increased risk in ovarian cancer for women who regularly use talc in the region of the abdomen or perineum.  Purdie, D., et al., *Reproductive and other factors and risk of epithelial ovarian cancer:  an Australian case-control study.  Survey of Women's Health Study Group*, 62 (6) Int. J. Cancer 678-684 (1995).

34.    In 1996, a case-control study similarly found a statistically significant 97% increased risk of ovarian cancer in women who used talc-based powders in their genital area.  *See* Shushan, A., et al, *Human menopausal gonadotropin and the risk of epithelial ovarian cancer*, 65 (1) Fertil. Steril. 13-18 (1995).

35.    In 1996, the condom industry stopped dusting condoms with talc due to the health concerns of ovarian cancer.  "Concern about talc as an ovarian carcinogen goes back 50 years in the medical literature.  By the 1970s, evidence was mounting that talc particles might migrate into a woman's fallopian tubes where they could cause scarring and irritation in the ovaries.  Scientists believed in some cases that the scarring led to infertility or cancer."  McCullough, Marie, *Women's health concerns prompt condom makers to stop using talc*,

Jersey Journal (City Edition) (April 17, 1996).

36.     In 1997, a case control study of 313 women with ovarian cancer and 422 without this disease found that the women with cancer were more likely to have applied talcum powder to their external genitalia area.  Women using these products had a statistically significant 50% to 90% higher risk of developing ovarian cancer.  *See* Cook, L.S., et al., *Perineal powder exposure and the risk of ovarian cancer*, Am. J Epidemiol. 145, 459-465 (1997).

37.     In 1997, a case-control study was conducted by Stella Chang and Harvey Risch from the Department of Epidemiology and Public Health, Yale University School of Medicine which included over 1,000 women.  The study found a statistically significant increased risk of 42% for ovarian cancer for women who applied talc via sanitary napkins to their perineum.  The study indicated that "Commercial talc substitutes often replace talc with cornstarch.  Furthermore, women may choose to powder or dust with cornstarch instead of talc.  When cornstarch was assessed in relation to risk of ovarian carcinoma, no associations were found."  The study concluded, "The results of this study appear to support the contention that talc exposure increases risk of ovarian carcinoma.  Dusting with talcum powder is not an unusual practice for women, and, given the heterogeneity of the etiology and course of ovarian carcinoma, any possible harmful practices, particularly those with little benefit, should be deliberated."  Chang, S. & Risch, H.A., *Perineal talc exposure and risk of ovarian carcinoma*, 79 (12) Cancer 2396-2401 (1997).

38.     In a 1998 case-control study conducted in Canada by Beatrice Godard, et al., a 149% increased risk of ovarian cancer was found in women who used talc-based powders on their perineum.  Godard, B., et al., *Risk factors for familial and sporadic ovarian cancer among French Canadians:  a case-control study*, 179 (2) Am. J. Obstet. Gynecol. 403-410 (1998).

39.     Daniel Cramer from the Obstetrics-Gynecology Epidemiology Center, Department of Obstetrics and Gynecology, Brigham and Women's Hospital conducted another case-control study in 1999 of 563 women newly diagnosed with epithelial ovarian cancer and

BLOOD HURST & O'REARDON, LLP

523 control women. The study found a statistically significant 60% increased risk of ovarian cancer in women that used talc-based body powders on their perineum. "We conclude that there is a significant association between the use of talc in genital hygiene and risk of epithelial ovarian cancer that, when viewed in perspective of published data on this association, warrants more formal public health warnings." The study was funded by a grant from the National Cancer Institute (NCI). Cramer, D.W., et al, *Genital talc exposure and risk of ovarian cancer*, 81 (3) Int. J. Cancer 351-356 (1999).

40. In 2000, Roberta Ness, et al., from University of Pennsylvania, produced a case-control study of over 2,000 women. This study found a statistically significant 50% increased risk of ovarian cancer from genital talc use in women. The study also found that talc causes inflammation and that inflammation contributes to cancer cell development. Ness, R.B., et al., *Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer*, 11 (2) Epidemiology 111-117 (2000).

41. Also in 2000, a prospective cohort study considered to be the most informative study to date, found a 40% increase in invasive serous cancers from women who applied talcum powder to their perineum. Gertig, D.M., et al., *Prospective study of talc use and ovarian cancer*, 92 J. Natl. Cancer Inst. 249-252 (2000).

42. In 2004, Paul Mills, Deborah Riordan, Rosemary Cress and Heather Young of Cancer Registry of Central California – Public Health Institute, Fresno, California; Fresno Medical Education Program, University of California, San Francisco, Fresno, California; California Cancer Registry, Sacramento, California; and the Department of Epidemiology and Biostatistics, George Washington University School of Public Health and Health Services, performed a case-control study of nearly 1400 women from 22 counties in Central California. This study found a statistically significant 37% increased risk of epithelial ovarian cancer from women's genital talc use. The study also found a 77% increased risk of serous invasive ovarian cancer from women's genital talc use. The study looked at women's use of cornstarch powders and found no increased risk in ovarian cancer in women who used these types of powders on the perineum as "Cornstarch is also not thought to exert the same toxicologic

BLOOD HURST & O'REARDON, LLP

reaction in human tissue as does talc."  This study concluded by stating, "… users should exercise prudence in reducing or eliminating use.  In this instance, the precautionary principle should be invoked, especially given that this is a serious form of cancer, usually associated with a poor prognosis, with no current effective screening tool, steady incidence rates during the last quarter century and no prospect for successful therapy.  Unlike other forms of environmental exposures, talcum powder use is easily avoidable."  Mills, P.K., et al., *Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California*, 112 Int. J. Cancer 458-64 (2004).

43.    In 2007, Amber Buz'Zard and Benjamin Lau performed a study whereby they induced carcinogenesis by applying talc to normal human epithelial and granulosa ovarian cancer cell lines.   Buz'Zard A.R., et al., *Pycnogenol reduces talc-induced neoplastic transformation in human ovarian cell cultures*, 21 (6) Phytother. Res. 579-586 (2007).

44.    In 2008, Margaret Gates, of Channing Laboratory, Department of Medicine, Brigham and Women's Hospital and Harvard Medical School; Departments of Epidemiology and Biostatistics, Harvard School of Public Health; Obstetrics and Gynecology Epidemiology Center, Brigham and Women's Hospital, and Norris Cotton Cancer Center, Dartmouth-Hitchcock Medical Center, performed a combined study of over 3,000 women from a New England-based case-control study and a prospective Nurses' Health Study with additional cases and years of follow up from these studies (the "Gates Study").  This study was funded by the National Cancer Institute (NCI), and found a general 36% statistically significant increased risk of epithelial ovarian cancer from genital talc use.  A 60% increased risk of the serous invasive subtype was also found.

45.    Dr. Gates found a strong and positive dose-response relationship whereby increased risk was seen with higher talc usage in women.  Dr. Gates commented about this study saying these latest results "provide additional support for a main effect of genital talc exposure on epithelial ovarian cancer."  She also stated that "…the finding of highly significant trends between increasing frequency of use and risk 'strengthens the evidence of an association, because most previous studies have not observed a dose response.'"  It was

BLOOD HURST & O'REARDON, LLP

13                                          Case No.
**CLASS ACTION COMPLAINT**

concluded that, "We believe that women should be advised not to use talcum powder in the genital area, based on our results and previous evidence supporting an association between genital talc use and ovarian cancer risk.  Physicians should ask the patient about talc use history and should advise the patient to discontinue using talc in the genital area if the patient has not already stopped."  Dr. Gates further stated that "An alternative to talc is cornstarch powder, which has not been shown to increase ovarian cancer risk, or to forgo genital powder use altogether."  Gates, M.A., et al., *Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer*, 17 (9) Cancer Epidemiology, Biomarkers & Prev. 2436-2444 (2008).

46.    In May 2008, the CPC, joined by its chairman and numerous other physicians and chairs of public health and medical associations, submitted a citizen's petition "seeking a cancer warning on cosmetic talc products."[1]  The petition sought to require all cosmetic talc products to bear labels with warnings such as, "Frequent application of talcum powder in the female genital area substantially increases the risk of ovarian cancer" or "Frequent talc application in the female genital area *is responsible* for major risks of ovarian cancer." (emphasis added).  The petition cited numerous studies and publications and sought a hearing to present scientific evidence.

47.    In October of 2008, Michael Thun, Vice-President of Epidemiology and Surveillance Research at the American Cancer Society commented on the Gates Study.  He stated the dose-response relationship between talc and ovarian cancer had finally been satisfied by this study.  Dr. Thun said, "There are very few modifiable risk factors for ovarian cancer.  The main one is the use of oral contraceptives, which has been clearly established to lower the risk for ovarian cancer.  Others include tubal ligation, hysterectomy, and parity.  Then there

---

[1]   The petition was submitted on behalf of: Samuel S. Epstein, M.D., Chairman, CPC, and Professor emeritus Occupational and Environmental Medicine, University of Illinois at Chicago School of Public Health; Peter Orris, M.D., Professor and Chief of Service, University of Illinois at Chicago Medical Center; Quentin Young, M.D., Chairman, Health and Medicine Policy Research Group, Chicago; Rosalie Bertell, Ph.D., International Association for Humanitarian Medicine, Scientific Advisor to the International Institute of Concern for Public Health, Toronto, and the International Science Oversight Board of the Organic Consumers Association, Washington, D.C.; and Ronnie Cummins, National Director of the Organic Consumers Association.

BLOOD HURST & O'REARDON, LLP

are factors that 'probably' increase the risk for ovarian cancer, and this is where talc fits in, alongside asbestos, postmenopausal hormone therapy, and radiation."  Chustecka, Zosia & Lie, Desiree, *Talc Use in Genital Area Linked to Increased Risk for Ovarian Cancer*, Medscape Medical News (2008).

48.     In 2008, Melissa Merritt, from the Australian Cancer Study (Ovarian Cancer) and Australian Ovarian Cancer Study Group, conducted a case-control study of over 3,000 women where a statistically significant 17% increased risk of ovarian cancer for women who used talc on their perineum was confirmed.  This study also confirmed a statistically significant 21% increased risk of ovarian cancer of a serous subtype in women who used talc on their perineum.  Merritt, M.A., et al., *Talcum powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer*, 122 (1) Int. J. Cancer 170-176 (2008).

49.     In 2009, a case-control study of over 1,200 women found the risk of ovarian cancer increased significantly with increasing frequency and duration of talc use.  The study found an overall statistically significant 53% increased risk of ovarian cancer from genital talc use.  The study also found a 108% statistically significant increased risk of ovarian cancer in women with the longest duration and most frequent talc use.  The study concluded by stating, "… that risk of ovarian cancer is significantly associated with talc use and with a history of endometriosis, as has been found in recent studies."  Wu, A.H., et al., *Markers of inflammation and risk of ovarian cancer in Los Angeles County*, 124 (6) Int. J. Cancer 1409-1415 (2009).

50.     In 2011, Daniel Cramer of Brigham and Women's Hospital, Harvard Medical School, made public another case-control study of over 4,000 women.  This study, which was funded by the National Cancer Institute (NCI), found a 200% to 300% increased risk of ovarian cancer for women who applied talc-based body powders to their perineum.  This study found a strong dose-response relationship and explained why the dose-response has been under reported in prior studies.  In commenting on this study, Dr. Cramer stated "I have always advised gynecologists, if they examine a woman and see that she is using talc in the vaginal area, tell her to stop…  There are alternatives.  This study strongly reinforces that advice."

51.     In 2011, another case-control study of over 2,000 women found a 27% increased risk of ovarian cancer from genital talc use in women.  Rosenblatt, K.A., et al., *Genital powder exposure and the risk of epithelial ovarian cancer*, 22 Cancer Causes Control 737-742 (2011).

52.     In June of 2013, Kathryn Terry, et al., published a pooled analysis of over 18,000 women in eight case-control studies and found a 20% to 30% increased risk of women developing epithelial ovarian cancer from genital powder use.  The study concluded by stating, "Because there are few modifiable risk factors for ovarian cancer, avoidance of genital powders may be a possible strategy to reduce ovarian cancer incidence."  Terry, K.L., et al., *Genital Powder Use and Risk of Ovarian Cancer:  A Pooled Analysis of 8,525 Cases and 9,859 Controls*, 6 (8) Cancer Prevention Research, 81-82 (2013).

53.     In addition to the numerous case control studies over the last several decades, several meta-analyses were conducted on the topic of talcum powder use and ovarian cancer.  A meta-analysis is a statistical technique that allows similar measures of the same illness and exposure from different studies to be combined to determine whether an association exists.  All analyses found a significant positive association between the use of talcum powder in the genital area and ovarian cancer.

54.     In 1992, the National Cancer Institute sponsored the first meta-analysis conducted by Bernard Harlow and Daniel Cramer from Harvard Medical School at Brigham and Women's Hospital.  This was the most comprehensive study to date whereby 235 cases with ovarian cancer were compared to 239 controls.  Through personal interviews with these women Harlow and Cramer found that nearly 17% of the control group reported frequent talc application to the perineum.  The study found "the most frequent method of talc exposure was use as a dusting powder directly to the perineum (genitals) … Brand or generic 'baby powder' was used most frequently and was the category associated with a statistically significant risk for ovarian cancer."  The study concluded that "a lifetime pattern of talc use may increase the risk for epithelial ovarian cancer," and that "[g]iven the poor prognosis for ovarian cancer, any potentially harmful exposures should be avoided, particularly those with limited benefits.  For

BLOOD HURST & O'REARDON, LLP

1    this reason, we discourage the use of talc in genital hygiene, particularly as a daily habit."

2    Harlow, B.L. et al., *Perineal exposure to talc and ovarian cancer risk*, Obstet. Gynecol. 1992,

3    19-26.   The summary OR (and 95% confidence interval) was 1.3 (1.1, 1.6) indicating a

4    statistically significant 30% increased risk of ovarian cancer from genital talc use.

5    55.   In 1995, a second meta-analysis conducted by A. J. Gross and P. H. Berg

6    included data from nine separate papers, which yielded a summary odds ratio (based upon the

7    crude measures) of 1.27 (1.09, 1.48) – again a statistically significant 27% increased risk of

8    ovarian cancer from genital talc use.   *See* Gross, A.J. & Berg, P.H., *A meta-analytical*

9    *approach examining the potential relationship between talc exposure and ovarian cancer*, 5

10   (2) J. Expo. Anal. Environ. Epidemiol. 181-195 (1995).

11   56.   David Cramer performed the third meta-analysis in 1999 supported by the

12   National Cancer Institute.   It included all of the studies in the Gross and Berg meta-analysis

13   plus four new studies as well as the OR based upon a new series of 563 cases with ovarian

14   cancer and 523 controls from Massachusetts and New Hampshire.   The summary odds

15   estimate was 1.39 (1.24, 1.49), again a statistically significant 39% increased risk of ovarian

16   cancer from genital talc use.

17   57.   In 2003, a fourth meta-analysis funded by the industry re-analyzed data from 16

18   studies published prior to 2003 and found a 33% increase in ovarian cancer risk among talc

19   users.   *See* Huncharek, M., et al., *Perineal application of cosmetic talc and risk of invasive*

20   *epithelial ovarian cancer:   a meta-analysis of 11,933 subjects from sixteen observational*

21   *studies*, 23 Anticancer Res. 1955-60 (2003).

22   **B.    All Leading Authorities Agree on the Link Between Ovarian Cancer and**
         **Perineal Use of Talc Powder**
23

24   58.   In 2005, the Fifth Edition of "Myths & Facts about ovarian cancer.   What you

25   need to know," was published by Steven Piver, M.D., and Gamal Eltabbakh, M.D.   This

26   publication was partly sponsored by Glaxo Smith Kline.   Dr. Piver is the Chair Emeritus of the

27   Department of Gynecologic Oncology, and Founder and Director of the Gilda Radner Familial

28   Ovarian Cancer Registry at Roswell Park Cancer Institute, Buffalo, New York.   Dr. Eltabbakh

BLOOD HURST & O'REARDON, LLP

is a tenured Professor of Obstetrics and Gynecology and Medicine, and Director of the Division of Gynecologic Oncology at the University of Vermont in Burlington, Vermont. In the section entitled "What Causes Ovarian Cancer?" it lists "Use of Talc (Baby Powder) in the Genital Area" as a risk factor for causing ovarian cancer and further states, "… research has established that each has at least a small role" in causing cancer in women.

59.     In February of 2006, the International Association for the Research of Cancer (IARC) part of the World Health Organization published a paper whereby they classified genital use of talc-based body powder as a "Group 2B" possible human carcinogen. IARC, which is universally accepted as the international authority on cancer issues, concluded that studies from around the world consistently found an increased risk in ovarian cancer in women from perineal use of talc. IARC found that between 16-52% of women in the world were using talc to dust their perineum and found an increased risk of ovarian cancer in women talc users ranging from 30-60%.

60.     IARC concluded with this "Evaluation": "There is limited evidence in humans for the carcinogenicity of perineal use of talc-based body powder." By definition "Limited evidence of carcinogenicity" means "a positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence." IARC concluded with this "Overall evaluation:" "Perineal use of talc-based body powder is possibly carcinogenic to humans (Group 2B)."

61.     In 2006, the Canadian government under The Hazardous Products Act and associated Controlled Products Regulations classified talc as a "D2A," "very toxic," "cancer causing" substance under its Workplace Hazardous Materials Information System (WHMIS). Asbestos is also classified as "D2A".

62.     As of today, both the National Cancer Institute and American Cancer Society list genital talc use as a "risk factor" for ovarian cancer. Additionally, the Gilda Radner Familial Ovarian Cancer Registry, Roswell Park Center Institute, and the Department of Gynecologic Oncology University of Vermont publish a pamphlet entitled "Myths & Facts

BLOOD HURST & O'REARDON, LLP

00069681

about ovarian cancer: What you need to know." This pamphlet is given to all ovarian cancer patients at nearly every medical facility in the United States. In this pamphlet under "known" risk factors for ovarian cancer is "Use of Talc (Baby Powder) in the Genital Area." Similarly, on the Sanford Medical Center website for "patient information" regarding ovarian cancer it lists "Talcum powder dusted on the perineum" as a risk factor for contracting ovarian cancer.

**C.     Defendants Have Been Acutely Aware of the Dangers of the Baby Powder**

63.     As early as 1982, Defendants were acutely aware of the scientific evidence linking ovarian cancer and perineal use of talcum powder. In an August 12, 1982, New York Times article entitled "Talcum Company Calls Study on Cancer Link Inconclusive," Defendants admitted being aware of the 1982 Cramer study that concluded women were three times more likely to contract ovarian cancer after daily use of talcum powder in the genital area.

64.     On November 10, 1994, the Cancer Prevention Coalition ("CPC") mailed a letter to then J&J's CEO, Ralph Larson, informing Defendants that studies as far back as 1960's ". . . show[] conclusively that the frequent use of talcum powder in the genital area poses a serious risk of ovarian cancer." The letter cited a study by Dr. Bernard Harlow from Harvard Medical School confirming this fact and quoted a portion of the study where Dr. Harlow and his colleagues discouraged the use of talc in the female genital area. The letter further stated that 14,000 women per year die from ovarian cancer and that this type of cancer is very difficult to detect and has a low survival rate. The letter concluded by requesting that Defendants withdraw talc products from the market because of the alternative of cornstarch powders, or at a minimum, place warning information on its talc-based body powders about the ovarian cancer risk they pose.

65.     On September 17, 1997, Alfred Wehner a toxicology consultant retained by Defendants, wrote a letter to Michael Chudkowski, manager of Pre-Clinical Toxicology at Johnson & Johnson Consumer Products, Inc., stating that on three separate occasions the Talc Interested Party Task Force (TIPTF) of the Cosmetic, Toiletry, and Fragrance Association (CTFA) which included Defendants and Luzenac (Defendants' supplier of talc), had released

Case No.

**CLASS ACTION COMPLAINT**

BLOOD HURST & O'REARDON, LLP

false information to the public about the safety of talc.  Specifically addressing a November

17, 1994, statement released by the CTFA, Dr. Wehner said the following:

> The response statement dated November 17, 1994, is just as bad.  The second sentence in the third paragraph reads:  "The workshop concluded that, although some of these studies suggested a weak association might exist, when taken together the results of the studies are insufficient to demonstrate any real association."  This statement is also inaccurate, to phrase it euphemistically.  At that time there had been about 9 studies (more by now) published in the open literature that did show a statistically significant association between hygienic talc use and ovarian cancer.  Anybody who denies this risks that the talc industry will be perceived by the public like it perceives the cigarette industry: denying the obvious in the face of all evidence to the contrary.

> The workshop did not conclude that "the results of the studies are insufficient to demonstrate any real association."  As pointed out above, a "real" statistically significant association has been undeniably established independently by several investigators, which without doubt will be readily attested to by a number of reputable scientists/clinicians, including Bernard Harlow, Debra Novotny, Candace Sue Kasper Debra Heller, and others.

66.     In 2006, Imerys began placing an ovarian cancer warning on its Material Safety

Data Sheets (MSDS) it provides to Defendants.  These MSDSs not only provided the warning

information about the IARC classification but also included warning information regarding

"States Rights to Know" and warning information about the Canadian Government's "D2A"

classification of talc as well.  Although Defendants admittedly received these MSDSs, they

never passed this warning information on to the consumers.  On September 26, 2012, the

corporate representative of Imerys testified in open court that his company exclusively

supplied Defendants with talc used for its Baby Powder product and that ovarian cancer is a

potential hazard associated with a women's perineal use of talc-based body powders, like

Defendants' Baby Powder.

67.     On October 19, 2012 Defendants' former in-house toxicologist and current

consulting toxicologist, Dr. John Hopkins, testified on Defendants' behalf that Defendants

"[are] and were aware of...all publications related to talc use and ovarian cancer."

68.     On October 4, 2013, a jury in South Dakota Federal Court, in the case styled

*Deane Berg v. Johnson & Johnson Consumer Companies, Inc.,* unanimously found that

Johnson & Johnson Consumer Companies, Inc. caused the plaintiff's ovarian cancer and was

negligent in failing to warn about cancer hazards on its talc-based body powders, specifically, Baby Powder and Shower to Shower.

**Defendants Failed to Warn Consumers About the Risks of**

**Using Johnson's® Baby Powder**

69.    Despite the overwhelming scientific and medical evidence regarding talc use and ovarian cancer that has developed over the past several decades, the only warnings on the Baby Powder label are to "Keep powder away from child's face to avoid inhalation, which can cause breathing problems," and to "[a]void contact with eyes." The label also states: "SAFETY TIP: Keep out of reach of children. Do not use if quality seal is broken." Defendants provide similar warnings on their website: "For external use only. Keep out of reach of children. Close tightly after use. Do not use on broken skin. Avoid contact with eyes. Keep powder away from child's face to avoid inhalation, which can cause breathing problems."

70.    None of Defendants' warnings on the product label or in other marketing informed Plaintiff and Class members that use of the product in the genital area, as was encouraged by Defendants, could lead to an increased risk of ovarian cancer. Instead, Defendants continue to represent on the labeling and other marketing that Johnson's® Baby Powder is "clinically proven mildness" and "clinically proven to be safe, gentle and mild."

71.    Plaintiff and Class members have been and will continue to be deceived or misled by Defendants' omissions and deceptive representations that Johnson's® Baby Powder is safe for women to use in the genital area. Plaintiff purchased and used Johnson's® Baby Powder reasonably believing that the product was safe. Because Johnson's® Baby Powder is advertised for use by women and does not instruct that the product is may lead to an increased risk for ovarian cancer when used in the genital area but instead that the product is clinically proven safe and mild, Defendants' omissions and representations were a material factor in influencing Plaintiff's decision to purchase Johnson's® Baby Powder. Plaintiff would not have purchased Johnson's® Baby Powder had she known that Johnson's® Baby Powder was not safe and use of which could lead to an increased risk for ovarian cancer. Plaintiff and

BLOOD HURST & O'REARDON, LLP

00069681

1    Class members had a reasonable expectation that Johnson's® Baby Powder was safe.

2        72.    As a result, Plaintiff and the Class members have been damaged in their

3    purchases of Johnson's® Baby Powder and have been deceived into purchasing products that

4    they reasonably believed, based on Defendants' omissions and representations, were safe for

5    use by women when, in fact, they are not.

6        73.    Defendants, by contrast, reaped and continue to reap enormous profits from

7    their deceptive marketing and sale of Johnson's® Baby Powder.

8                    **CLASS DEFINITION AND ALLEGATIONS**

9        74.    Plaintiff brings this action on behalf of herself and all other similarly situated

10   pursuant to Rule 23(a), (b)(2), and (b)(3)of the Federal Rules of Civil Procedure and seeks

11   certification of the following Class:

12           All persons who purchased Johnson's® Baby Powder in California and states

13           with laws that do not conflict with the laws asserted here.

14   Excluded from the Class are Defendants, their parents, subsidiaries, affiliates, officers and

15   directors, those who purchased Johnson's® Baby Powder for the purpose of resale, and those

16   who assert claims for personal injury.

17       75.    Members of the Class are so numerous and geographically dispersed that

18   joinder of all Class members is impracticable.  Plaintiff is informed and believes, and on that

19   basis alleges, that the proposed Class contains many thousands of members.  The precise

20   number of Class members is unknown to Plaintiff.

21       76.    Common questions of law and fact exist as to all members of the Class and

22   predominate over questions affecting only individual Class members.  The common legal and

23   factual questions include, but are not limited to, the following:

24       i.     Whether Defendants knew or should have known that use of talcum powder can

25              lead to an increased risk of ovarian cancer;

26       ii.    Whether Defendants had a duty to inform Plaintiff and Class members of the

27              risks associated with certain uses of Johnson's® Baby Powder;

28   ///

BLOOD HURST & O'REARDON, LLP

iii.     Whether Defendants' representations concerning the safety and appropriate uses of Johnson's® Baby Powder were likely to deceive;

iv.     Whether Defendants' alleged conduct violates public policy;

v.     Whether the alleged conduct constitutes violations of the laws asserted herein;

vi.     Whether Defendants engaged in false and misleading advertising;

vii.     Whether Plaintiff and Class members have sustained monetary loss and the proper measure of that loss;

viii.     Whether Plaintiff and Class members are entitled to restitution, disgorgement of Defendants' profits, declaratory and/or injunctive relief; and

ix.     Whether Plaintiff and Class members are entitled to an award of compensatory damages.

77.     The claims asserted by Plaintiff in this action are typical of the claims of the members of the Class, as the claims arise from the same course of conduct by Defendants, and the relief sought is common.  Plaintiff and Class members suffered uniform damages caused by their purchase of Johnson's® Baby Powder manufactured, marketed, and sold by Defendants.

78.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained counsel competent and experienced in both consumer protection and class litigation.

79.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The expense and burden of individual litigation would make it impracticable or impossible for proposed Class members to prosecute their claims individually.  It would thus be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs done to them.  Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action

Case No.

**CLASS ACTION COMPLAINT**

BLOOD HURST & O'REARDON, LLP

00069681

1  device provides the benefits of adjudication of these issues in a single proceeding, economies

2  of scale, and comprehensive supervision by a single court, and presents no unusual

3  management difficulties under the circumstances here.

4      80.    In the alternative, the Class also may be certified because Defendants have

5  acted or refused to act on grounds generally applicable to the Class thereby making final

6  declaratory and/or injunctive relief with respect to the members of the Class as a whole

7  appropriate.

8                          **COUNT I**

9              **Violation of the Consumers Legal Remedies Act**

10                    **Civil Code §1750 *et seq.***

11     81.    Plaintiff seeks preliminary and permanent injunctive and equitable relief on

12  behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and

13  prevent Defendants from engaging in the acts described, and requiring Defendants to provide

14  full restitution to Plaintiff and Class members.

15     82.    Unless a Class is certified, Defendants will retain monies that were taken from

16  Plaintiff and Class members as a result of their conduct.  Unless a Class-wide injunction is

17  issued, Defendants will continue to commit the violations alleged, and the members of the

18  Class and the general public will continue to be misled.

19     83.    Plaintiff re-alleges and incorporates by reference the allegations contained in

20  the paragraphs above as if fully set forth herein.

21     84.    This cause of action is brought under the Consumers Legal Remedies Act,

22  California Civil Code §1750, *et seq.* (the "Act").  Plaintiff is a consumer as defined by

23  California Civil Code §1761(d).  Johnson's® Baby Powder products are goods within the

24  meaning of the Act.

25     85.    Defendants violated and continues to violate the Act by engaging in the

26  following practices proscribed by California Civil Code §1770(a) in transactions with Plaintiff

27  and the Class which were intended to result in, and did result in, the sale of the Johnson's®

28  Baby Powder products:

BLOOD HURST & O'REARDON, LLP

(5)     Representing that [the Products] have . . . approval, characteristics, . . . uses [and] benefits . . . which [they do] not have . . . .

\*          \*          \*

(7)     Representing that [the Products] are of a particular standard, quality or grade . . . if [they are] of another.

\*          \*          \*

(9)     Advertising goods . . . with intent not to sell them as advertised.

\*          \*          \*

(16)    Representing that [the Products have] been supplied in accordance with a previous representation when [they have] not.

86.     Defendants violated and continue to violate the Act by failing to disclose material facts on the Johnson's® Baby Powder product labels and packages as described above when they knew, or should have known, that use of Johnson's® Baby Powder by women was not safe and could cause a significant increased risk of ovarian cancer. Defendants further violated the Act by representing that the Johnson's® Baby Powder is clinically proven to be safe, gentle and mild.

87.     Pursuant to §1782(d) of the Act, Plaintiff and the Class seek a court order enjoining the above-described wrongful acts and practices of Defendants and for restitution and disgorgement.

88.     Pursuant to §1782 of the Act, Plaintiff notified Defendants in writing by certified mail of the particular violations of §1770 of the Act and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to so act.  Copies of the letters are attached hereto as Exhibit A.  If Defendants fail to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to §1782 of the Act, Plaintiff will amend this complaint to add claims for actual, punitive and statutory damages, as appropriate.

89.     Defendants' conduct is malicious, fraudulent and wanton, and provides misleading information.

90.     Pursuant to §1780(d) of the Act, attached hereto as Exhibit B is the affidavit showing that this action has been commenced in the proper forum.

BLOOD HURST & O'REARDON, LLP

**COUNT II**

**Violation of Business & Professions Code §17200, *et seq.***

91.     Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

92.     As alleged herein, Plaintiff has suffered injury in fact and lost money or property as a result of Defendants' conduct because she purchased Johnson's® Baby Powder.

93.     In the course of conducting business, Defendants committed unlawful business practices by, *inter alia*, omitting material facts concerning the safety of Johnson's® Baby Powder, making representations (which also constitute advertising within the meaning of §17200) as set forth more fully herein, and violating Civil Code §§1572, 1573, 1709, 1711, 1770(a)(5), (7), (9) and (16) under the CLRA, Business & Professions Code §§17200, *et seq.*, 17500, *et seq.*, and the common law, including breach of implied warranty and negligent misrepresentation.  Defendants' above-described wrongful acts and practices constitute actual and constructive fraud within the meaning of Civil Code §§1572 and 1573, as well as deceit, which is prohibited under Civil Code §§1709 and 1711.

94.     Plaintiff and the Class reserve the right to allege other violations of law, which constitute other unlawful business acts or practices.  Such conduct is ongoing and continues to this date.

95.     Defendants' omissions, non-disclosures, acts, misrepresentations, and practices as alleged herein also constitute "unfair" business acts and practices within the meaning of Business and Professions Code §17200 *et seq.*, in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

96.     As stated in this complaint, Plaintiff alleges violations of consumer protection, unfair competition and truth in advertising laws, resulting in harm to consumers.  Plaintiff asserts violations of the public policy of engaging in false and misleading advertising, unfair competition and deceptive conduct towards consumers.  This conduct constitutes violations of the unfair prong of Business & Professions Code §17200 *et seq*.

Case No.
00069681

97.     There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

98.     Defendants' claims, nondisclosures and misleading statements, as more fully set forth above, are also false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code §17200 *et seq.*

99.     Defendants' labeling and packaging as described herein, also constitutes unfair, deceptive, untrue and misleading advertising.

100.    Defendants' conduct caused and continues to cause substantial injury to Plaintiff and the other Class members.  Plaintiff has suffered injury in fact and has lost money as a result of Defendants' unfair conduct.

101.    Plaintiff, on behalf of himself, and all other similarly situated California residents, seeks restitution of all money obtained from Plaintiff and the members of the Class collected as a result of unfair competition, an injunction prohibiting Defendants from continuing such practices, corrective advertising and all other relief this Court deems appropriate, consistent with Business & Professions Code §17203.

**COUNT III**

**Negligent Misrepresentation**

102.    Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

103.    Defendants have known or should have known, for decades, of the overwhelming scientific and medical evidence that use of talc-based products like Johnson's® Baby Powder in the genital area may lead to a significant increased risk of ovarian cancer. Despite this knowledge, Defendants misrepresented that the Baby Powder was clinically proven to be safe when they knew or should have known that there is an increased risk of ovarian cancer for women who use talc powders in the genital area.

104.    Defendants intended that Plaintiff and the Class rely on its representations that the Baby Powder was safe for use.  Had Plaintiff and the Class known that use of the Baby Powder in the genital area could lead to an increased risk of ovarian cancer, they would not

BLOOD HURST & O'REARDON, LLP

1    have purchased the Baby Powder.  As a result of Defendants' material misrepresentations,

2    Plaintiff and the Class were damaged in the amount of the purchase price of the Baby Powder.

3                                                    **COUNT IV**

4                                    **Breach of Implied Warranty**

5           105.   Plaintiff re-alleges and incorporates by reference the allegations contained in

6    the paragraphs above as if fully set forth herein.

7           106.   The Uniform Commercial Code §2-314 provides that, unless excluded or

8    modified, a warranty that the goods shall be merchantable is implied in a contract for their sale

9    if the seller is a merchant with respect to goods of that kind.

10          107.   At all times, California and the following 48 states, including the District of

11   Columbia, have codified and adopted the provisions the Uniform Commercial Code governing

12   the implied warranty of merchantability: Ala. Code §7-2-314; Alaska Stat. §45.02.314; Ariz.

13   Rev. Stat. Ann. §47-2314; Ark. Code Ann §4-2 314; Cal. Comm. Code §2314; Colo. Rev. St

14   §4-2-314; Conn. Gen. Stat. Ann. §42a-2-314; 6 Del. C. §2-314; D.C. Code §28:2-314; Fla.

15   Stat. Ann §672.314; Ga. Code. Ann. §11-2-314; Haw. Rev. Stat. §490:2-314; Id. Code §28-2-

16   314; Ill. Comp. Stat. Ann. Ch 810, 5/2-314; Ind. Code. Ann. §26-1-2-314; Iowa Code Ann.

17   §554.2314; Kansas Stat. Ann. §84-2-314; Ky. Rev. Stat. Ann §355.2-314; La. Civ. Code Ann.

18   Art. §2520; 11 Maine Rev. Stat. Ann. §2-314; Md. Code Ann. §2-314; Mass. Gen. Laws. Ch.

19   106 §2-314; Mich. Comp. Laws Ann. §440.2.314; Minn. Stat. Ann §336.2-314; Miss. Code.

20   Ann. §75-2-314; Missouri Rev. Stat §400.2-314; Mont. Code. Ann §30-2-314; Nev. Rev. Stat.

21   U.C.C §104.2314; N.H. Rev. Ann. §382-A:2-314; N.J. Stat. Ann. §12A:2-314; N.M. Stat. Ann

22   §55-2-314; N.Y. U.C.C. Law 2-314; N.C. Gen. Stat. Ann §25-2-314; N.D. Stat. §41-02-314;

23   Ohio Rev. Code Ann. §1302.27; Okla. Stat. §2-314; Or. Rev. Stat. §72.3140; Pa. Stat. Ann

24   §2314; R.I. Gen Laws §6A-2-314; S.C. Code Ann. §36-2-314; S.D. Stat. 57A-2-314; Tenn.

25   Code Ann. §47-2-314; Tex. Bus. & Com. Code Ann. §2-314; Ut. Code Ann. §70A-2-314; VA.

26   Code §8.2-314; Vt. Stat. Ann §9A-2-314; W. VA. Code §46-2-314; Wis. Stat. Ann §402.314;

27   and Wyo. Stat. §34.1-2-314.

28   ///

BLOOD HURST & O'REARDON, LLP

108.    Johnson's® Baby Powder is a "good," as defined in the various states' commercial codes governing the implied warranty of merchantability.

109.    As designers, manufacturers, licensors, producers, marketers, and sellers of Johnson's® Baby Powder, Defendants are "merchants" within the meaning of the various states' commercial codes governing the implied warranty of merchantability.

110.    By placing Johnson's® Baby Powder in the stream of commerce, Defendants impliedly warranted that Johnson's® Baby Powder is reasonably safe, effective and adequately tested for intended use, *i.e.*, to be used as a daily use powder intended to eliminate friction on the skin and to absorb unwanted excess moisture for both babies and women, and that it was of merchantable quality.

111.    As merchants of Johnson's® Baby Powder, Defendants knew that purchasers relied upon them to design, manufacture, license and sell baby powder that was reasonably safe, and in fact members of the public, including Plaintiff, reasonably relied upon the skill and judgment of Defendants and upon said implied warranties in purchasing and using Johnson's® Baby Powder.

112.    Plaintiff and the Class members purchased Johnson's® Baby Powder for its intended purpose.

113.    In breach of its implied warranty, Johnson's® Baby Powder is unsafe and not merchantable, in that it causes serious and even fatal health problems.

114.    Johnson's® Baby Powder was not reasonably safe for its intended use when it left Defendants' control and entered the market.

115.    The Johnson's® Baby Powder defects were not open or obvious to consumers, including Plaintiff and the Class, who could not have known about the nature of the risks associated with Johnson's® Baby Powder until after they purchased or used Johnson's® Baby Powder.

116.    As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff and Class members have sustained injuries by purchasing Johnson's® Baby Powder, which was not safe as represented, thus entitling Plaintiff to judgment and equitable relief

BLOOD HURST & O'REARDON, LLP

Case No.

**CLASS ACTION COMPLAINT**

against Defendants, as well as restitution, including all monies paid for Johnson's® Baby

Powder and disgorgement of profits from Defendants received from sales of Johnson's® Baby

Powder, attorneys' fees, punitive damages, and costs, as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for a judgment:

A.    Certifying the Class as requested herein;

B.    Awarding Plaintiff and the proposed Class members damages;

C.    Awarding restitution and disgorgement of Defendant's revenues to Plaintiff and the proposed Class members;

D.    Awarding declaratory and injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with court supervision, victims of their conduct and pay them restitution and disgorgement of all monies acquired by Defendant by means of any act or practice declared by this Court to be wrongful;

E.    Ordering Defendant to engage in a corrective advertising campaign;

F.    Awarding attorneys' fees and costs; and

G.    Providing such further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 28, 2014

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
LESLIE E. HURST (178432)
THOMAS J. O'REARDON II (247952)
PAULA M. ROACH (254142)

By:         _s/ Timothy G. Blood_
TIMOTHY G. BLOOD

701 B Street, Suite 1700
San Diego, CA  92101
Tel: 619/338-1100

BLOOD HURST & O'REARDON, LLP

00069681

Case No.

CLASS ACTION COMPLAINT

619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
proach@bholaw.com

BEASLEY, ALLEN, CROW, METHVIN,
    PORTIS & MILES, P.C.
W. DANIEL "DEE" MILES, III
LANCE C. GOULD
ALISON DOUILLARD HAWTHORNE
272 Commerce Street
Post Office Box 4160
Montgomery, AL 36103
Tel: 334/269-2343
224/954-7555 (fax)
Dee.Miles@BeasleyAllen.com
Lance.Gould@BeasleyAllen.com
Alison.Hawthorne@BeasleyAllen.com

THE SMITH LAW FIRM
ALLEN SMITH, JR.
618 Towne Center Blvd., Suite B
Ridgeland, MS  39157
Tel: 601/952-1422
601/952-1426 (fax)
allen@smith-law.org

*Attorneys for Plaintiff and the Class*

BLOOD HURST & O'REARDON, LLP

Case No.

**CLASS ACTION COMPLAINT**

00069681